ALFREDO RONDÓN, por conducto de su padre con patria potestad, JOSÉ MARÍA RONDÓN, demandante y apelante, *v.* THE AETNA CASUALTY & SURETY Co., demandada y apelada.

Núm. 7950.—*Sometido:* Enero 4, 1940. *Resuelto:* Marzo 30, 1940.

*Miguel Olmedo Toste,* abogado del apelante; *Hartzell, Kelly & Hartzell* y *Rafael O. Fernández,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

Este caso, iniciado ante la Corte de Distrito de San Juan en el año 1926, después de numerosas controversias que dieron lugar a dos apelaciones ante esta Corte Suprema (41 D.P.R. 101 y 46 D.P.R. 613), fué a juicio en abril de 1937.

Se trata de cobrar a la compañía de seguros demandada el importe de una sentencia dictada en contra de un porteador público por ella asegurado. Los hechos alegados en la demanda son como sigue:

Juan Basabe, dueño de una guagua, se dedicaba al negocio de transportar pasajeros mediante paga en San Juan, para lo cual estaba autorizado por la Comisión de Servicio Público. En cumplimiento de la regla III del Reglamento de dicha Comisión, Basabe radicó una fianza o póliza, para responder de la indemnización que se adjudicare a cualquier persona lesionada como resultado de un accidente causado por negligencia del porteador o de sus empleados, hasta la suma de $3,000.

El aquí demandante y apelante demandó a Basabe ante la Corte de Distrito de San Juan, en reclamación de daños y perjuicios por lesiones sufridas en febrero 13, 1926, en un accidente motivado por la negligencia de un empleado del demandado, y obtuvo sentencia por la que Basabe fué condenado a pagar una indemnización de $3,000, más costas y honorarios que se fijaron en $602.75. El mandamiento expedido para la ejecución de dicha sentencia fué devuelto por el márshal sin cumplimentar, por ser Basabe insolvente y carecer de bienes embargables.

Se alega en la demanda que Basabe cumplió las condiciones contenidas en la póliza en relación con el accidente y con la acción contra él entablada; y que la compañía demandada no obstante haber tenido conocimiento de la iniciación de dicho pleito, lo abandonó y no intervino ni se hizo parte en la acción.

Contestó la compañía demandada, negando todos y cada uno de los hechos esenciales de la demanda, y especialmente que ella abandonara la acción entablada por el demandante contra Basabe, alegando en contrario que Basabe se negó a cooperar y no cooperó con la demandada en la defensa de dicha acción, violando así las condiciones de la póliza, por lo que la demandada quedó libre de responsabilidad. Alegó

además que Basabe violó las condiciones de la póliza porque en el momento del accidente el vehículo era manejado por una persona que no tenía ni la edad ni la licencia requeridas por la ley, quedando por ello la demandada libre de responsabilidad bajo la póliza.

Visto el caso, la corte inferior dictó sentencia desestimando la demanda, con costas al demandante, sin incluir honorarios de abogado.

La corte sentenciadora declaró como hechos concluyentemente probados que las lesiones sufridas por el demandante fueron causadas por la negligencia de un empleado de Basabe; que Basabe fué condenado a pagar al demandante una indemnización por los daños causádosle; y que la sentencia no se pudo hacer efectiva por ser Basabe insolvente. Y definió el *issue* fundamental entre las partes así:

"A nuestro juicio, la única cuestión a resolver es . . . si en efecto en el momento del accidente el vehículo asegurado era guiado por persona que no tenía la edad ni la licencia requeridas por la ley."

El resumen de la prueba aducida por una y otra parte con referencia a dicha cuestión, hecho por la corte sentenciadora, es el siguiente:

"Presentó en evidencia el demandante una certificación negativa del Registrador Demográfico de San Juan creditiva de que en sus libros no aparece el acta de nacimiento de Julio Basabe, persona que manejaba el vehículo en el momento del accidente.

"Presentó la demandada una certificación del mismo Registro Demográfico, en la que aparece que Julián Basabe Fernández, hijo legítimo de Juan Basabe y de Ana Fernández, nació el 10 de noviembre de 1910.

"De la prueba testifical resulta concluyentemente probado que Juan Basabe, el asegurado por la póliza objeto de este pleito, es ó era casado con Ana Fernández y que en su matrimonio no tuvo otro hijo además de Julio que fuera conocido con el nombre de Julián, demostrándose así que la certificación de nacimiento de Julián Basabe no corresponde a otro hijo que además de Julio tuviera Juan Basabe en su matrimonio con Ana Fernández.

"Es de conocimiento general la costumbre de nuestro pueblo de usar indistintamente los nombres de Julio y Julián como si fuera el mismo, y conocemos también la tendencia en la gente del pueblo a abreviar los nombres suprimiendo sílabas unas veces al principio y otras al final del mismo.

"Trató de probar el demandante que el Julián Basabe que según el acta de nacimiento nació en el año 1910 es un hijo natural de Juan Basabe y Saturnina Dávila, que Basabe inscribió como hijo de su matrimonio con Ana Fernández; pero aparte de que no hay prueba alguna que sostenga esta teoría, sino una mera conjetura del demandante, resulta además que de acuerdo con la declaración de Severiano Ortiz, testigo del demandante y compadre e íntimo amigo de Juan Basabe y su familia, el Julián hijo de Saturnina es hombre de bastante edad, mayor que el hijo mayor de Ana Fernández, llamado Juan, calculándose por el testigo que el Julián hijo de Saturnina tiene como 40 años de edad.

En demostración de la imposibilidad de que el acta de nacimiento de Julián Basabe Fernández presentada en evidencia por la demandada sea el Julián hijo de Saturnina Dávila, vamos a transcribir los siguientes párrafos de la declaración del testigo Severiano Ortiz:

" 'P.—¿Ud. conoce a alguna persona conocida por Julián Basabe?

" 'R.—Sí, señor.  Él está ahí afuera.  Lo conozco.

" 'P.—¿Además de Julio está ése?

" 'R.—Sí, señor, hijastro de Juan Basabe.

" 'P.—Que usted sepa, ¿Julio alguna vez se ha conocido por Julián?

" 'R.—No, señor, Julio o Julio Basabe.

" 'P.—Dígale a la Corte qué intimidad ha tenido con esta familia desde el nacimiento de este muchacho.

" 'R.—Le voy a explicar: Juan Basabe era pintor en la Estación Naval, y yo era albañil de la Estación Naval, y Julián Basabe, de pequeñito llevaba el almuerzo y la comida allí.

" 'P.—¿Julián, el hijastro?

" 'R.—Sí, señor, el hijastro es Julián, que llevaba la comida todos los días, y Juan vivía con la madre de Julián y tenía a Julián y a tres más; después se casó con la mamá de Juan y de Julio, y otros más que están vivos.  Cuando nació Juan, me puso de compadre y bauticé a Juan Basabe, que está un hombre.  Fuí el padrino, y somos compadres.

" 'P.—Con esta familia, ¿qué relaciones tiene Ud. desde entonces?

" 'R.—Somos amigos desde muchachos, y además trabajando, y compadres. Estamos relacionados como familia nada más.'

"Si antes de casarse Juan Basabe y Ana Fernández ya había tenido aquél tres hijos con Saturnina Dávila, y el hijastro, Julián, que naturalmente era mayor que estos tres hijos de Saturnina, y tenía edad suficiente para llevar comida a su padrastro a su trabajo en la Estación Naval, lo que requiere una edad no menos de 7 años, es lógico inferir que debe ser no menos de 10 años mayor que el Julio Basabe hijo de Ana Fernández, que como resulta de la prueba no es el hijo mayor del matrimonio. Siendo ello así, la gran diferencia de edad impide que se confunda el uno con el otro. Además, el propio demandante, en su demanda contra Juan Basabe en el pleito núm. 1253 que motivó la sentencia que ha dado base a esta acción, no parece ignorar esta circunstancia, cuando en el párrafo tercero de su última demanda enmendada, radicada el 28 de junio de 1926, alegó lo siguiente:

" '3. Que la guagua que causó las tales lesiones al demandante es la núm. 49, la Palmira, de la propiedad de dicho demandado, Juan Basabe, e iba guiada en el momento del accidente por un hijo de dicho demandado, Julio Basabe, que hacía de chófer, pero que no estaba autorizado para manejar tal vehículo.'

"No tenemos duda alguna, en virtud de las circunstancias expuestas, que la certificación de nacimiento presentada en evidencia por la parte demandada corresponde al Julio Basabe que guiaba el vehículo asegurado el día del accidente, y siendo ello así, y habiendo nacido éste según dicha certificación el 10 de noviembre de 1910, y ocurrido el accidente el 13 de febrero de 1926, en dicha fecha tenía el mencionado chófer la edad de 15 años, tres meses, tres días."

El apelante ha señalado como error de la corte inferior el haber considerado concluyentemente probada la edad del chófer Julio Basabe, con la certificación del Registro Demográfico correspondiente a Julián Basabe, y al sostener que el nombre Julio es un derivado o diminutivo de Julián.

Hemos hecho un cuidadoso estudio de la evidencia aducida por una y otra parte. No cabe duda alguna de que la persona que manejaba la guagua en el momento del accidente era Julio Basabe, hijo de Juan Basabe y de Ana Fernández. El certificado del Registro Demográfico, ofrecido en evidencia para demostrar que Julio Basabe Fernández

no tenía en la fecha del accidente la edad requerida por la ley para poder obtener una licencia de chófer, demuestra que Julián Basabe Fernández, hijo legítimo de Juan Basabe y de Ana Fernández, nació el 10 de noviembre de 1910. Si Julio y Julián son la misma persona, entonces el certificado establece el hecho de que la persona que guiaba el vehículo en febrero 13, 1926, tenía en esa fecha 15 años, tres meses y tres días de edad. La conclusión a que llegó la corte sentenciadora, o sea que Julio Basabe Fernández y Julián Basabe Fernández son la misma persona, está ampliamente justificada por la evidencia. La contención del apelante, de que el Julián Basabe Fernández a que se refiere el certificado no es el Julio Basabe Fernández que guiaba el vehículo y sí un hijo ilegítimo de Juan Basabe y Saturnina Dávila, no está sostenida por la evidencia. El propio Julián Basabe, al declarar en mayo 8, 1937, dijo que tenía 38 años de edad; que nació en 1898; y que cuando llegaron los americanos él tenía dos años de edad.

■ Aceptado, pues, que Julio Basabe Fernández, conductor del vehículo en el momento del accidente, no tenía la edad requerida por la ley para poder obtener licencia de chófer y que no tenía tal licencia, ¿cuál es el efecto legal de ese hecho sobre las obligaciones contraídas por la compañía demandada a virtud de la póliza por ella expedida?

La póliza en el caso de autos provee:

"Exclusiones.—La Compañía no será responsable por pérdida o daño . . . .; ni por ninguna pérdida o daño que ocurriere mientras el automóvil que en la presente queda descrito (a) estuviere participando en cualquier carrera de velocidad, *o fuese guiado por cualquier persona menor de la edad, según se fija por la ley, cuando puede obtenerse una licencia de conductor, o en todo caso menor de 16 años de edad;* . . ."

Entre las declaraciones del asegurado contenidas en la póliza se hace constar que el negocio u ocupación del asegurado es "Porteador Público"; y que el automóvil asegurado es una guagua de 22 pasajeros, dedicada al transporte de

pasajeros de San Juan por calle Condado, calle Loíza a calle Calma y viceversa.

La Regla III del Reglamento de la Comisión de Servicio Público, aprobado en junio 3, 1924, y a virtud de la cual Juan Basabe radicó la póliza en cuestión, dispone:

"Regla III.—La Comisión antes de autorizar la expedición del certificado de necesidad y conveniencia exigirá del peticionario la prestación de una fianza hipotecaria o por una compañía de seguros legalmente autorizada para hacer esta clase de negocios en Puerto Rico, por una cantidad que fijará la Comisión y que en ningún caso será menor de $3,000.00, por cada vehículo, y que responderá de la indemnización que se adjudique por el Tribunal correspondiente a cualquier persona que sufra lesión, daño o perjuicio en su persona o intereses, o a sus herederos en caso de muerte por virtud de cualquier accidente ocurrido y debido al uso descuidado, negligente o defectuoso del vehículo de motor utilizado como porteador público, ya sea éste operado directamente por el concesionario o por cualquiera de sus agentes, empleados o subalternos. . . . Tal fianza será aprobada por la Comisión de Servicio Público, después de examinada en cuanto a su forma y ejecución por el Attorney General de Puerto Rico; y archivada en la oficina del Secretario de la Comisión antes de que el vehículo a que se contraiga dicha fianza se ponga en el servicio."

En el caso anterior entre las mismas partes, 46 D.P.R. 613, 626, se resolvió:

"La regla tercera del reglamento de 1924 tuvo el claro propósito de garantizar al público en general exigiendo al porteador como requisito previo la prestación de una fianza hipotecaria o por una compañía de seguros para responder de la indemnización que pudiera adjudicarse por un tribunal a cualquier persona que sufriera a virtud del uso descuidado, negligente o defectuoso del vehículo."

Y se resolvió además que dicha regla tercera estaba en vigor en la fecha del accidente en que fué lesionado el demandante.

Arguye el apelante en su cuarto señalamiento de error que la corte inferior erró al considerar la póliza expedida y radicada a virtud de la Regla III, supra, simplemente como

una póliza de seguro ordinaria, cuando debió considerarla como una fianza o *"surety bond"*; que siendo el vehículo asegurado un porteador público, que se usará únicamente como *guagua* u *ómnibus,* la póliza archivada en este caso debe ser interpretada como *"surety bond"* o *"jitney bus bond"*; y que de acuerdo con esa interpretación ni la falta de cooperación del asegurado para la defensa del pleito, ni la negligencia del asegurado al permitir que la guagua fuese conducida por un menor sin licencia, pueden ser alegadas como defensas válidas en una acción para cobrar al asegurador el importe de la sentencia contra el asegurado.

La compañía demandada sostiene que el apelante está impedido de levantar de nuevo esa cuestión, por haber sido ésta discutida y resuelta en su contra en la apelación anterior (46 D.P.R. 613). En efecto, al resolver la cuestión sobre la suficiencia de la demanda, planteada mediante excepción previa, esta corte se expresó así:

"Creemos sí que debe interpretarse partiendo de la base de la vigencia de la regla y por tanto que debe resolverse que la compañía contrajo la directa obligación de pagar, hasta el límite fijado en la póliza, la indemnización que se pudiera adjudicar a cualquier persona que sufriera lesión por el tribunal correspondiente, pero creemos también que esa obligación está condicionada a las estipulaciones contenidas en la póliza. La compañía quedó obligada para con el público pero en la forma que aparece de la póliza, visada por el Procurador General y aceptada por la comisión. Existe nexo jurídico entre el demandante y la demandada, pero ese nexo está regulado por los términos de la póliza.

"\*     \*     \*     \*     \*     \*     \*

"La conclusión a que hemos llegado acerca de que existe un nexo jurídico entre las partes en este caso, está sostenida además por la propia cláusula de insolvencia de la póliza por virtud de la cual se autoriza el mantenimiento de una acción por el lesionado contra la compañía después de haber obtenido sentencia contra el asegurado y de haberse devuelto sin satisfacerse la orden de ejecución de dicha sentencia a causa de la insolvencia del asegurado. Pero también en tal caso el mantenimiento de dicha acción está predicado a las estipulaciones del contrato."

La autoridad en que se basó esta corte al hacer las precedentes declaraciones fué el caso de *Coleman* v. *New Amsterdam Casualty Co.*, 247 N. Y. 271. El caso es en realidad distinto al de autos, en cuanto a dos puntos fundamentales. En primer lugar, la acción en el caso de *Coleman* fué instituída de acuerdo con la sección 109 de la Ley de Seguros (Cons. Laws, ch. 28) de New York que dispone que la insolvencia o la quiebra del asegurado "no librará al asegurador del pago de daños y perjuicios," y "en caso de que la ejecución . . . sea devuelta sin satisfacer . . . por causa de tal insolvencia o quiebra, entonces la acción puede ser entablada por la persona perjudicada . . . contra tal corporación *bajo los términos de la póliza.*" El segundo punto de distinción es que en el caso de Coleman la asegurada, Endicott Drug Store, Inc., no estaba obligada por estatuto alguno a obtener una póliza de seguro para beneficio de sus clientes. Se trataba, pues, no de un seguro compulsorio y sí de una póliza obtenida voluntariamente por el asegurado, con sujeción a los requisitos de la póliza modelo, *"standard policy,"* de New York, que da derecho al beneficiario a demandar al asegurador, pero "bajo los términos de la póliza." El caso de *Coleman* es idéntico al del dueño de un automóvil privado, que no estando obligado por ley alguna a asegurarse, toma una póliza para protegerse en caso de alguna reclamación por daños causados por negligencia propia o de sus empleados. En esos casos, el lesionado está sujeto a las mismas defensas que el asegurador podría interponer contra el asegurado, por incumplimiento de alguna de las condiciones del contrato de seguro. Así lo sostienen los casos de *Rohlf* v. *Great American Mutual Indemnity Co.*, 27 Oh. App. 208, 161 N. E. 232; *Bauman* v. *Western & S. Indemnity Co.*, 77 S. W. (2d) 496; *McDanels* v. *General Insurance Co. of America*, 35 P. (2d) 394, citados por la parte apelada. Igual decisión dictó la Corte de California en *Hynding* v. *Home Accident Ins. Co.*, 214 Cal. 743, 7 P. (2d) 999. Y así lo sostuvo esta Corte Suprema en *González* v. *U. S. Casualty Co.*, 55

D.P.R. 668, decidido en noviembre 27, 1939, en el que se trataba de una póliza voluntariamente obtenida por el dueño de un autocamión.

En *González* v. *U. S. Casualty Co.*, supra, citando como autoridad la monografía que aparece publicada en 106 A.L.R. 516, 532, sostuvimos que la doctrina sentada por la mayoría de las jurisdicciones de Estados Unidos es al efecto de que la persona perjudicada por el accidente ocupa la misma posición legal que el asegurado, en lo que respecta a defensas basadas en incumplimiento de condiciones subsiguientes al accidente. Y de acuerdo con dicha doctrina resolvimos que González, el lesionado, no tenía derecho a cobrar a la compañía de seguros el importe de la sentencia dictada contra el dueño del autocamión, porque éste había infringido una de las condiciones de la póliza al dejar de notificar al asegurador inmediatamente después de tener conocimiento del pleito, enviándole la citación y copia de la demanda, según lo estipulado en la póliza.

La doctrina que correctamente aplicamos al caso de *González* v. *U. S. Casualty Co.*, supra, es aplicable solamente a casos en que la póliza ha sido tomada voluntariamente, y no a casos en que el seguro es compulsorio por disposición estatutaria. El título de la citada Monografía de American Law Reports, lee así:

"Validez, interpretación, y efecto de disposiciones estatutarias o de la póliza que conceden a la persona lesionada un derecho de acción contra el asegurador con respecto a seguro de indemnización o de responsabilidad *voluntariamente tomado* (voluntarily carried)."

Dicha Monografía comienza diciendo:

"1. Alcance (scope). Esta anotación suplementa la anterior en 85 A.L.R. 20 y se limita en su alcance al ya definido en aquélla. Según se hizo constar allí, *estas anotaciones no tienen que ver con el seguro compulsorio; . . . .*"

En efecto, todos los casos citados en dicha monografía se refieren a seguros voluntarios, y sostienen la doctrina que

aplicamos en el caso de González. Así, por ejemplo, en el caso de *Neilson* v. *American Mut. Liability Ins. Co.*, 111 N. J. Law 345, 168 A. 436, la corte sostuvo que está bien sentado que en casos contra el asegurador, la persona lesionada no tiene mayores derechos bajo la póliza que los que tiene el asegurado, el cual está obligado por los términos del contrato, y no puede recobrar daños y perjuicios a menos que el asegurado pudiese recobrarlos si hubiera pagado la sentencia.

Como se ve, la decisión en *Coleman* v. *New Amsterdam Casualty Co.*, supra, se basó en un estatuto que llevó a la póliza *"standard"* del Estado de New York la doctrina aplicable a casos de seguro voluntario.

■■ La cuestión que se nos plantea en el caso de autos es nueva en esta jurisdicción. Para resolverla, debemos guiarnos por los precedentes establecidos en otras jurisdicciones en casos similares de seguros compulsorios, rectificando si necesario fuere la opinión emitida en este mismo caso en el recurso anterior, 46 D.P.R. 613, en el que se trató solamente de la suficiencia de los hechos alegados, sin entrar a considerar el caso en su fondo.

En *Gillard* v. *Manufacturers' Casualty Ins. Co.* (N. J.), 104 A. 707, el demandante, lesionado en un accidente, demandó a la compañía de seguros para obtener el pago de una sentencia contra el asegurado, dueño de un "autobus". Éste había radicado una póliza de seguro en la ciudad de Newark, en cumplimiento de un estatuto que requería la radicación de dicha póliza para poder obtener una licencia autorizándole a dedicarse al transporte de pasajeros dentro de dicha ciudad. La Corte Suprema de New Jersey al confirmar la sentencia a favor del demandante, dijo:

"El primer fundamento de ataque es: los derechos del demandante son derivados y no pueden ser más extensivos que los del asegurado. Ésta es una asunción falsa; su contestación es, por el contrario, los derechos del demandante son originales y primarios, concedidos por el estatuto, que dispone: (Siguen aquí las disposi-

ciones del estatuto de New Jersey, similares a las de la Regla III del Reglamento de la Comisión de Servicio Público de Puerto Rico). Por virtud de esta disposición del estatuto, sólo el lesionado puede demandar bajo la póliza cuya radicación se requiere. Ésta es una característica esencial que distingue este caso de aquella clase de casos en que no existe ese derecho de acción, porque las partes en la acción no son partes en el contrato en que se basa la acción, como en (citas). El dueño del *autobus* no puede demandar sobre la póliza de seguro estatutaria. . . .

"La póliza de seguro no puede contener disposición alguna que no esté autorizada por el estatuto, de manera que pueda afectar a cualquier persona que sufra daño, de acuerdo con lo que en ella se dispone. Cualesquiera otras disposiciones contenidas en la póliza radicada pueden ser válidas entre el asegurador y el dueño del *autobus*, el asegurado, y pueden imponer a este último ciertos deberes y obligaciones, por el incumplimiento de los cuales el asegurador puede entablar una acción; pero esas disposiciones no pueden privar a una persona lesionada del remedio provisto por el estatuto, ni pueden en modo alguno restringir los derechos concedidos por el estatuto a esa persona lesionada. La póliza de seguro es radicada solamente para beneficio de las personas que puedan ser lesionadas. No se radica para beneficio de la ciudad. La ciudad no tiene responsabilidad alguna contra la cual sea protegida por la póliza. El estatuto fué aprobado solamente para beneficio del perjudicado. El único beneficiario del estatuto es la persona lesionada. Ésta es la única que puede demandar sobre la póliza y citar el estatuto como fundamento de su acción. Los derechos de la persona lesionada, en la póliza de seguro, son originales y primarios, no derivados y secundarios. El primer fundamento de ataque, por consiguiente, no puede tener éxito, porque la premisa en que el mismo se basa es de hecho falsa."

Apelado el caso para la Corte de Errores y Apelaciones de New Jersey, ésta confirmó la sentencia de la Corte Suprema, diciendo:

"Se insiste en que el derecho del demandante a instituir esta acción es de carácter derivativo, y depende enteramente de los derechos del asegurado bajo los términos de la póliza. La aplicación de este argumento va dirigida hacia el hecho de que habiendo dejado el asegurado de dar aviso del accidente y de la pendencia del pleito, al asegurador, según éste lo requería por las disposiciones de la

póliza, el derecho del demandante en este caso a recobrar debe ser determinado por la posición legal en que se ha colocado el asegurado, la que en efecto constituye una violación del contrato.

"Es obvio que al hacer esta contención no se tuvo en cuenta la disposición expresa de la póliza, ya citada, que evidentemente tenía por objeto hacer frente a la situación que se nos presenta, pues dispone 'que no obstante cualquiera otra disposición en contrario aquí contenida, esta Compañía pagará cualquier sentencia final dentro de los límites de esta póliza, obtenida por cualquier persona o personas por razón de la posesión, sostenimiento o uso del automóvil aquí descrito' etc., y la disposición adicional de que 'este contrato será para beneficio de toda persona que sufra pérdida, daño o lesión,' etc. *Gillard* v. *Manufacturers' Ins. Co.,* 107 A. 446.

En *Boyle* v. *Manufacturers' Liability Ins. Co.,* 115 A. 383, se interpuso como defensa en la acción del lesionado para cobrar la sentencia dictada contra el dueño de una guagua, que el motor original de la guagua había sido cambiado después del otorgamiento de la póliza y substituído por otro motor de diferente tipo. Al confirmar la sentencia a favor del lesionado demandante, la Corte Suprema de New Jersey dijo:

"Esa adjudicación demuestra que la póliza de seguro de *autobus* es una póliza de indemnización bajo el estatuto, para beneficio del público que viaja, y que cualesquiera derechos legales o equidades que puedan subsistir entre el asegurado y el asegurador por razón de cualquier violación de los términos de la póliza no pueden afectar los derechos del público que reclama de acuerdo con sus disposiciones, después que esa reclamación ha sido substanciada por una sentencia legal. . . .

"El efecto legal que tales cambios puedan causar entre el asegurado y el asegurador no puede tener relación legal alguna con la obligación que el asegurador tiene contraída con el público que viaja y que puede ser perjudicado por la negligencia del vehículo mientras está dedicado a su acostumbrado uso público." (Confirmada por la Corte de Errores y Apelaciones de New Jersey, 117 A. 295.)

El propósito evidente del estatuto que regula el servicio público de transportación de pasajeros por medio de *autobuses* o "guaguas" es no permitir al dueño del vehículo uti-

lizarlo en dicho servicio si antes no presta *una fianza,* que puede ser hipotecaria o suscrita por una compañía de seguros, para responder del pago de la sentencia que se dicte a favor de cualquier persona que sea lesionada "por virtud de cualquier accidente ocurrido y debido al uso descuidado, negligente o defectuoso del vehículo de motor utilizado como porteador público." La intención del legislador ha sido dar a los que viajan en *autobuses* públicos y a los viandantes la garantía absoluta de una fianza, en cualquiera de las dos formas autorizadas, para protegerles contra los daños y perjuicios que pueda causarles la negligencia del porteador público o de las personas a quienes él confía la conducción y manejo de sus vehículos.

Las obligaciones que el fiador o asegurador contrae para con el público al otorgar la fianza o la póliza de seguro son y a nuestro juicio no pueden ser otras que las fijadas por el estatuto. El lesionado no es parte en el contrato de fianza o de seguro; es simplemente un tercero para cuyo beneficio se ha contraído una obligación estatutaria. La protección y garantía que para él ha provisto el estatuto no puede ni debe ser menoscabada o afectada en manera alguna por las estipulaciones que el fiador o asegurador y el fiado o asegurado hayan tenido a bien insertar en el contrato de fianza o de seguro para regular las relaciones entre las partes contratantes.

La aprobación de la fianza o póliza por la Comisión de Servicio Público "después de examinada en cuanto a su forma y ejecución por el Attorney General de Puerto Rico," no puede tener el efecto de disminuir o limitar la garantía estatutaria, haciendo responsable al lesionado de los actos y omisiones del porteador público. Ni la Comisión ni el Attorney General están facultados para alterar o enmendar las disposiciones del estatuto. Si la fianza o póliza ofrecida por el porteador público contiene todos los requisitos del estatuto y es suficiente en cuanto a su forma y ejecución, es deber de la Comisión y del Attorney General aprobarla. Ni la una

ni el otro están facultados para aprobar o desaprobar las estipulaciones adicionales entre el asegurador y el asegurado.

Existe a nuestro juicio una razón fundamental para que la doctrina aplicable al caso de seguro voluntario no lo sea al de seguro compulsorio. En el seguro voluntario el asegurador se obliga con el asegurado a pagar el importe de la indemnización que se adjudique a cualquier persona lesionada como consecuencia de la negligencia del asegurado en el manejo de su automóvil, sin tener en cuenta la insolvencia o quiebra del asegurado. Cuando el accidente ha sido causado por negligencia del asegurado y éste ha cumplido con los términos y condiciones de su contrato con el asegurador, éste está obligado a pagar la indemnización aun cuando el asegurado tenga medios para hacerlo; y no puede el asegurador recurrir contra el asegurado para resarcirse de lo que por su culpa se vió obligado a pagar. Por esas razones, y por estar él obligado por los términos de la póliza, es que el estatuto (Ley. de Seguro, 1921, sec. 175) permite al lesionado dirigir su acción de daños y perjuicios contra el asegurador y el asegurado conjuntamente. El estatuto reconoce que entre el lesionado y las partes en el contrato de seguro existe el nexo jurídico de tercero para cuyo beneficio se ha celebrado el contrato de seguro.

Cuando como en el presente caso el seguro es compulsorio la situación legal es distinta. La obligación del fiador o asegurador con el público es que si el porteador público causa daños a alguna persona, como consecuencia de su negligencia en la conducción o funcionamiento del vehículo y es condenado a pagar una indemnización y no puede pagarla por ser insolvente o estar en quiebra, el fiador o asegurador hará efectivo el importe de la sentencia a favor del lesionado. Es por esa razón que el lesionado por un *autobus* dedicado al servicio público está obligado primeramente a dirigir su acción y obtener sentencia contra el porteador público; y su derecho de acción contra la compañía aseguradora no nace hasta que la orden de ejecución de sentencia ha sido devuelta sin haberse podido hacer efectiva por razón de la insolvencia

o quiebra del deudor de la sentencia. Véanse: Regla III
(E) del Reglamento de la Comisión de Servicio Público y
*Rondón* v. *The Aetna Casualty & Surety Co.*, 41 D.P.R. 101,
en el que esta Corte Suprema sostuvo la validez de dicho
Reglamento y resolvió que el lesionado no tenía derecho
alguno de acción contra la compañía aseguradora, ni el dere-
cho a embargar sus bienes, mientras no obtuviese una sen-
tencia en contra del porteador. Como se ve, la obligación
de la compañía aseguradora es, como la de todo fiador, de
carácter subsidiario. Si el porteador asegurado no paga por-
que no tiene con qué pagar, entonces el asegurador paga por
él. En realidad de lo único que responde la compañía ase-
guradora en esta clase de seguros es de la solvencia del asegu-
rado para el pago de las sentencias que contra él puedan
recaer. El fiador, asegurador o garantizador del porteador
puede protegerse mediante los convenios o estipulaciones que
crea conveniente insertar en el contrato de seguro, pero esos
convenios o estipulaciones no pueden en modo alguno afec-
tar los derechos estatutarios del lesionado.

Se dirá que lo que acabamos de exponer deja al asegu-
rador huérfano de protección contra la falta de cumplimiento
por parte del porteador de los términos y condiciones de la
póliza, pues siendo el asegurado insolvente o quebrado el
asegurador no podría recurrir contra él para resarcirse de
la cantidad pagada al tercero lesionado. A eso puede res-
ponderse que la compañía aseguradora, como parte intere-
sada en el negocio de seguros, está en mejores condiciones y
tiene mejores oportunidades y medios para protegerse que
los que pueda tener el viandante que sin culpa o negligencia
por su parte se ve arrollado por una guagua guiada por una
persona, que aun cuando no estuviera autorizada por la ley
para guiarla, sí lo estaba por el porteador fiado o asegurado
por la compañía aseguradora. Ésta puede protegerse fácil-
mente, investigando la situación económica del solicitante de
una póliza, negándose a expedirla si el solicitante no tiene
responsabilidad económica o exigiendo al solicitante garantía
colateral. El ciudadano que transita por las calles y vías

públicas tiene derecho a esperar que la ley aprobada para su protección y beneficio sea cumplida y que si por desgracia y sin culpa o negligencia por su parte es lesionado, la indemnización que le otorguen las cortes de justicia le será pagada de acuerdo con la ley por el porteador público o en su defecto por su fiador o asegurador. Sostener lo contrario equivaldría a nulificar el estatuto.

No nos convence la contención de la parte apelada de que la cuestión envuelta en este recurso fué ya prejuzgada y resuelta en contra del apelante. No nos creemos investidos del don de la infalibilidad. Y si por una errónea interpretación del alcance de la decisión en el caso de *Coléman* v. *New Amsterdam Casualty Co.*, supra, al sostener la excepción previa a la demanda resolvimos que el demandante en el caso de autos debía alegar en su demanda el cumplimiento por parte del porteador asegurado de los términos y condiciones de la póliza, ahora, al estudiar y resolver el caso en su fondo, después de un estudio más detenido de la jurisprudencia aplicable a esta cuestión, que es nueva en esta jurisdicción, no debemos dudar en rectificar y dejar sin efecto en cuanto a este extremo nuestra opinión en el recurso anterior, publicada en 46 D.P.R. 613.

Por las razones expuestas, opinamos que el derecho del demandante a cobrar a la demandada el importe de la sentencia dictada a su favor no puede ser afectado por los actos realizados por el asegurado al negarse a cooperar en la defensa del pleito y al entregar el manejo de la guagua a una persona no autorizada para guiar automóviles.

*Debe revocarse la sentencia recurrida y en su lugar dictarse otra condenando a la demandada a pagar al demandante la suma de $3,000 por indemnización, más la suma de $602.75 por concepto de costas y honorarios de abogado, o sea un total de $3,602.75, más intereses legales al 6% sobre dicha suma, desde diciembre 6, 1926, fecha en que se dictó la sentencia a su favor, hasta su pago total.*

El Juez Asociado Sr. De Jesús no intervino.